[Cite as *Hostetler v. Cent. Farm and Garden, Inc.*, 2012-Ohio-507.]

COURT OF APPEALS
TUSCARAWAS COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | |
|---|---|
| WILLIAM HOSTETLER | JUDGES: |
| | Hon. W. Scott Gwin, P. J. |
| Plaintiff-Appellant/Cross-Appellee | Hon. John W. Wise, J. |
| | Hon. Julie A. Edwards, J. |
| -vs- | |
| | Case No. 2010 AP 12 0046 |
| CENTRAL FARM AND GARDEN, INC. | |
| | |
| Defendant-Appellee/Cross-Appellant | O P I N I O N |

CHARACTER OF PROCEEDING: Civil Appeal from the Court of Common Pleas, Case No. 2009 CV 07 0629

JUDGMENT: Affirmed

DATE OF JUDGMENT ENTRY: February 9, 2012

APPEARANCES:

For Plaintiff-Appellant

DAVID P. BERTSCH
BUCKINGHAM, DOOLITTLE
& BURROUGHS
3800 Embasy Parkway
Suite 300
Akron, Ohio 44333

For Defendant-Appellee

DAVID J. WIGHAM
ANDREW P. LYCANS
CRITCHFIELD, CRITCHFIELD &
JOHNSON
225 North Market Street, P. O. Box 599
Wooster, Ohio 44691

*Wise, J.*

{¶1}  Appellant/Cross-Appellee William Hostetler appeals the decision of the Court of Common Pleas, Tuscarawas County, which denied his motion for directed verdict and subsequently denied his motion for judgment notwithstanding the verdict ("JNOV") or a new trial following a jury trial in a suit against Appellee/Cross-Appellant Central Farm and Garden, Inc., claiming breach of a business agreement. The relevant facts leading to this appeal are as follows.

{¶2}  Plaintiff-Appellant William Hostetler is a farmer who formerly operated an additional business known as Hostetler Farm Supply, a d/b/a started by his late father. Defendant-Appellee Central Farm and Garden, Inc. is a wholesale distributor of farm and garden supplies, including twine and fodder preservation products. Appellant Hostetler's business competed in part with Appellee Central Farm in selling twine to dealers and other commercial customers. Appellant Hostetler's business also sold twine, in lesser amounts, to some of his neighbors and other retail customers. Appellant at one time had an account with Appellee Central Farm to purchase twine at dealer prices for resale to said neighbors and other retail customers.

{¶3}  In the summer of 2004, appellee asked appellant, who generally was able to sell his product at a lower price, whether he would be willing to sell appellee some twine after appellee's supply ran low. Appellant agreed to sell the twine to appellee at his cost.

{¶4}  In September 2004, appellee's then co-owners, Joe Franks and Dick Olson, approached appellant about purchasing his business.[1]  Accordingly, in

---

[1]  Olson later became the sole owner of Appellee Central Farm.

December 2004, the parties executed a purchase agreement prepared by appellee's legal counsel. In the agreement, appellee agreed to acquire appellant's "customer list and price list" for a price of $275,000. This amount was to be paid in installments of $10,000 on December 31, 2004, $17,500 on September 1, 2005, and nine additional payments of $27,500 payable annually on September 1, 2006 through September 1, 2014. See Articles I and II of the agreement.

{¶5} Article V of the agreement provided for appellee to employ appellant as a commissioned sales representative on an annual renewable basis. The agreement does not clearly tie appellee's installment payment obligations to appellant's continued service as a sales representative. However, Section 5.1 states that "[d]uring the term of employment, [appellant] shall not engage in any activity which conflicts or interferes with the performance of duties hereunder or usurps the business interests, existing or potential, of [appellee]." Section 5.3(c) states that appellee would set the price at which appellant was to sell appellee's products, and that appellant could purchase twine at dealer cost.

{¶6} Section 7.3 of the agreement contained a noncompetition provision which prohibited appellant from competing against appellee for the following five years (i.e., until the end of 2009), as well as a provision entitling appellee to injunctive relief upon violation. Section 7.4 provided that appellee could set off its claimed damages under the noncompetition provision against the outstanding balance owed on the purchase price by giving notice to appellant, specifying in reasonable detail the basis for the set-off and depositing the amount of the claimed set-off in an escrow account at its law firm.

**{¶7}** After the agreement was executed, appellant delivered a list of the names and addresses for his commercial twine accounts to appellee, although it is presently undisputed that any copies thereof have been lost or destroyed by both parties. Appellant also provided appellee the names of his twine suppliers. Appellee in turn paid appellant the first $17,500 installment under the purchase agreement.

**{¶8}** Appellant continued to purchase twine from appellee at dealer cost under Section 5.3(c) of the agreement, which he resold to some of his neighbors and other retail customers. Appellant maintained at trial that he purchased approximately $175,000 of twine from Central Farm for resale to his neighbors and retail customers at a 5% profit for the three years from 2005 through 2007. See Tr. at 166-167.

**{¶9}** In July 2005, Appellee Central Farm made appellant a salaried employee at a rate of $40,000 per year plus the commission payments under the 2004 agreement, plus benefits. This additional agreement was for a term of one year automatically renewable in July of each successive year unless either party gave notice of discontinuation at least sixty days prior to the annual anniversary date.

**{¶10}** Appellant received the $17,500 purchase price installment payment in the autumn of 2005 and the $27,500 purchase price installment payment in the autumn of 2006.

**{¶11}** In September 2007, a dispute arose between Central Farm's co-owners Franks and Olson over a bank audit and inventory issues. Olson decided to remove Franks as president and appoint Corey Sheely, the company's marketing manager, as the new president. Sheely thereupon conducted a review of Central Farm's finances and the 2004 purchase agreement. Despite the terms of the additional 2005

agreement, on October 24, 2007, Sheely met with appellant and told him he was being taken off salary and returned to his original position as a commissioned salesman effective November 1, 2007. Sheely also told appellant in the meeting that Appellee Central Farm was discontinuing twine sales until at least the following spring. This was problematic for appellant, because most of his twine sales for appellee were made in the autumn and winter. Sheely allegedly did not give appellant any sales territory of his own when he put him back on commission.

{¶12} In the late autumn of 2007, Sheely told his sales staff that appellant would no longer be working for Central Farm. Sheely also instructed the sales representatives to see if appellant had been contacting any Central Farm customers.

{¶13} Appellee Central Farm did pay Hostetler the September 1, 2007 installment of $27,500 at the end of October. However, appellee's vice-president, David Guster, told appellant not to attend any further sales meetings since there was no twine to sell. Appellant subsequently told Guster he had taken a job as a long-distance truck driver and asked Guster to notify him upon appellee's resumption of twine sales.

{¶14} In December 2007, Appellee Central Farm's former president Franks, along with his wife, went into the twine business, operating under the name JBF. Sheely suspected appellant had gone into this business with Franks and personally began asking some of appellee's customers if appellant was selling them twine.

{¶15} Appellee Central Farm ultimately resumed twine sales the following spring, but Guster never contacted appellant to let him know or invite him to any subsequent sales meetings.

{¶16} Appellant has maintained that he never went into the twine business with Franks, never provided any services to Franks, and never solicited any customer on behalf of Franks or JBF.

{¶17} Appellant has also maintained that after he began work as a long-distance trucker in late October 2007, he also discontinued selling twine to his neighbors and other retail customers. In February 2008, Hostetler received his last monthly account statement from Central Farm, which showed he was still owed $16,739.23 in credits. In April 2008, Hostetler sent a letter to Central Farm requesting that it close his account and send him a check for the $16,739.23 account balance. Appellant's attorney sent a follow-up letter in May 2008 again requesting that appellee send the outstanding balance of credits claimed on the account. Appellee never responded to either letter.

{¶18} Appellee Central Farm then failed to make the $27,500 payment on the purchase price that was due and payable on September 1, 2008. Appellant asserts that appellee never gave the requisite notice to him under Section 7.4 of the agreement that it was withholding this payment as a set-off for claimed damages attributable to any alleged breach of the agreement by appellant.

{¶19} On July 9, 2009, Appellant Hostetler filed a civil complaint for breach of the purchase agreement, breach of contract, breach of account, and a demand for account stated. On September 8, 2009, appellee filed an answer and counterclaim.

{¶20} The matter proceeded to a jury trial for nearly four days in late October 2010. Appellant moved for a directed verdict at the close of evidence on appellee's counterclaim, asserting there was no competent evidence that appellant had

committed any material breach of the agreement and no evidence that appellee had sustained any damages. The motion for directed verdict was denied.

{¶21} Appellant submitted a proposed set of interrogatories asking the jury to make a finding as to whether and in what manner appellant had breached the agreement and the amount of any resulting damages. The trial court declined to submit the proposed jury interrogatories. See Tr. at 491.

{¶22} After hearing the evidence, the jury returned a verdict awarding appellant $25,240 on his account claim, which was subsequently reduced by way of a stipulated remittitur to the $16,739.23 outstanding account balance. The jury also returned a verdict in favor of appellant on appellee's counterclaim for breach of agreement, but did not render a verdict for appellant on his claim for the $192,500 remaining balance appellant claimed was owed on the purchase price. The trial court thereafter issued a final entry on the verdicts which included a declaratory judgment relieving appellee from any further payment obligation under the agreement.

{¶23} The trial court subsequently denied appellant's motion for judgment notwithstanding the verdict ("JNOV") or a new trial.

{¶24} On December 10, 2010, appellant filed a notice of appeal. He herein raises the following four Assignments of Error:

{¶25} "I.    THE TRIAL COURT COMMITTED PREJUDICIAL ERROR IN ENTERING A DECLARATORY JUDGMENT THAT DEFENDANT BE RELIEVED FROM HAVING TO PAY THE $192,500 BALANCE OWED FOR THE PURCHASE OF PLAINTIFF'S WHOLESALE BUSINESS AND IN DENYING PLAINTIFF'S MOTIONS FOR DIRECTED VERDICT AND JUDGMENT NOTWITHSTANDING THE VERDICT

GIVEN THE ABSENCE OF ANY COMPETENT EVIDENCE THAT PLAINTIFF BREACHED THE AGREEMENT, THE ABSENCE OF ANY COMPETENT EVIDENCE THAT DEFENDANT SUSTAINED ANY DAMAGES AS A RESULT OF ANY ALLEGED BREACH AND THE JURY VERDICT IN FAVOR OF PLAINTIFF ON DEFENDANT'S CLAIM THAT PLAINTIFF BREACHED THE AGREEMENT.

{¶26} "II.   THE TRIAL COURT COMMITTED PREJUDICIAL ERROR IN REPEATEDLY ALLOWING DEFENDANT OVER PLAINTIFF'S ONGOING OBJECTIONS TO PRESENT INCOMPETENT HEARSAY EVIDENCE IN SUPPORT OF ITS CLAIM THAT PLAINTIFF VIOLATED THE NON-COMPETITION PROVISION OF THE PURCHASE AGREEMENT.

{¶27} "III.   THE TRIAL COURT COMMITTED PREJUDICIAL ERROR IN REFUSING TO SUBMIT PLAINTIFF'S PROPOSED JURY INTERROGATORIES ON WHETHER AND IN WHAT RESPECT PLAINTIFF BREACHED THE AGREEMENT AND THE DAMAGES ATTRIBUTABLE TO ANY SUCH BREACH.

{¶28} "IV.   THE TRIAL COURT COMMITTED PREJUDICIAL ERROR IN DENYING PLAINTIFF'S MOTION FOR NEW TRIAL ON ITS [SIC] CLAIM FOR THE REMAINING BALANCE DEFENDANT OWES ON THE PRICE FOR THE PURCHASE OF PLAINTIFF'S ASSETS BASED UPON THE MANIFEST WEIGHT OF THE EVIDENCE."

{¶29} Appellee Central Farm has filed a cross-appeal herein. It herein raises the following two Assignments of Error on cross-appeal:

**{¶30}** "I.  THE JURY'S VERDICT IN FAVOR OF HOSTETLER AND AGAINST CENTRAL FARM ON THE ACCOUNT CAUSE OF ACTION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

**{¶31}** "II.  THE JURY'S VERDICT IN FAVOR OF HOSTETLER AND AGAINST CENTRAL FARM ON THE ACCOUNT STATED CAUSE OF ACTION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."

### *Hostetler Appeal*

### I.

**{¶32}** In his First Assignment of Error, appellant contends the trial court erred in relieving appellee, via declaratory judgment after the jury's verdict, of responsibility for paying the remaining $192,500 under the 2004 purchase agreement and in his denying motion for JNOV and/or for a directed verdict. We disagree.

**{¶33}** As an appellate court, we are not fact finders. We neither weigh the evidence nor judge the credibility of witnesses. Our role is to determine whether there is relevant, competent and credible evidence upon which the jurors could base their judgment. Accordingly, judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed as being against the manifest weight of the evidence. The triers of fact have the duty to decide what weight is to be given to the evidence and to assess the credibility of the witnesses. See *Cox v. Storsin,* Stark App.No. 2003CA00263, 2004-Ohio-3714, ¶ 11 (additional citations omitted).

**{¶34}** In regard to motions for judgment notwithstanding the verdict (JNOV), Civ.R. 50(B) states as follows:

**{¶35}** "Whether or not a motion to direct a verdict has been made or overruled and not later than fourteen days after entry of judgment, a party may move to have the verdict and any judgment entered thereon set aside and to have judgment entered in accordance with his motion; or if a verdict was not returned such party, within fourteen days after the jury has been discharged, may move for judgment in accordance with his motion. A motion for a new trial may be joined with this motion, or a new trial may be prayed for in the alternative. * * *."

**{¶36}** The standard for granting a motion for judgment notwithstanding the verdict or in the alternative for a new trial pursuant to Civ.R. 50(B) is the same as that for granting a motion for a directed verdict pursuant to Civ.R. 50(A). *Texler v. D.O. Summers Cleaners & Shirt Laundry Co.,* 81 Ohio St.3d 677, 679, 693 N.E.2d 271, 1998–Ohio–602. Thus, JNOV is proper if upon viewing the evidence in a light most favorable to the nonmoving party and presuming any doubt to favor the nonmoving party, reasonable minds could come to but one conclusion, that being in favor of the moving party. *Wagoner v. Obert,* 180 Ohio App.3d 387, 401–402, 905 N.E.2d 694, 2008–Ohio–7041, citing *Goodyear Tire & Rubber Co. v. Aetna Cas. & Sur. Co.,* 95 Ohio St.3d 512, 2002–Ohio–2842, ¶ 3. "Neither the weight of the evidence nor the credibility of the witnesses is for the [trial] court's determination in ruling upon [a JNOV]." *Osler v. Lorain* (1986), 28 Ohio St.3d 345, 347, 504 N.E.2d 19, quoting *Posin v. A.B.C. Motor Court Hotel* (1976), 45 Ohio St.2d 271, 275, 74 O.O.2d 427, 344 N.E.2d 334.

**{¶37}** The decision to grant or deny a Civ.R. 50(B) motion for JNOV is reviewed de novo by an appellate court. *Wagoner,* supra, at 401, citing *Osler,* supra, at 347.

**{¶38}** In regard to appellant's argument regarding a directed verdict, our standard of review for the grant or denial of a motion for a directed verdict is whether there is probative evidence which, if believed, would permit reasonable minds to come to different conclusions as to the essential elements of the case, construing the evidence most strongly in favor of the non-movant. *Brown v. Guarantee Title & Trust/Arta* (Aug. 28, 1996), Fairfield App.No. 94–41, citing *Sanek v. Duracote Corp.* (1989), 43 Ohio St.3d 169, 172, 539 N.E.2d 1114. A motion for a directed verdict therefore presents a question of law, and an appellate court conducts a de novo review of the lower court's judgment. *Howell v. Dayton Power & Light Co.* (1995), 102 Ohio App.3d 6, 13, 656 N.E.2d 957, 961.

**{¶39}** In the case sub judice, appellant essentially argues that the trial court should have set aside the jury's decision to relieve appellee of any further obligation to pay the remaining $192,500.00 balance on the original $275,000.00 purchase price of Hostetler Farm Supply pursuant to the 2004 purchase agreement, which he claims allowed appellee to enjoy an improper windfall. Appellant maintains that the evidence does not support the conclusion that he materially breached his end of said agreement, such that appellee would be legally entitled to relief from further payment.

**{¶40}** We have recognized that the mere breach of a term of a contract committed by a party who has substantially performed its obligations under the contract does not relieve the other party from performance. See *Oakes v. P.J. Bordner & Co.* (April 18, 1994), Stark App.No. CA 9488, 1994 WL 202397, citing *Software Clearinghouse, Inc. v. Intrak, Inc.* (1990), 66 Ohio App.3d 163 and *Kersh v. Montgomery Developmental Ctr.* (1987), 35 Ohio App.3d 61, 62. Thus, "[a] party is

relieved of performing its obligations only if the breach of contract committed by another is a 'material' breach." Id, citing *Software Clearinghouse,* supra. Once there has been a material breach of the contract, the nonbreaching party is not required to fulfill the remaining terms of the contract, and the breaching party is not entitled to collect damages from the nonbreaching party. See *Sites v. Moore* (1992), 79 Ohio App.3d 694, 701.

{¶41} In *Kersh,* supra, at 62-63, the court relied on the Restatement of the Law 2d, Contracts (1981) 237, Section 241, which sets forth five factors to be used to determine the materiality of a breach, including the extent to which the injured party will be deprived of the expected benefit, the extent to which the injured party can be adequately compensated for the lost benefit, the extent to which the breaching party will suffer a forfeiture, the likelihood that the breaching party will cure its breach under the circumstances, and the extent to which the breaching party has acted with good faith and dealt fairly.

### *Appellant's Covenant Not to Compete*

{¶42} In the case sub judice, the 2004 agreement provided that Appellant Hostetler would not "[p]romote or assist, financially or otherwise, any person ... or corporation engaged in any business which directly or indirectly competes with the farm and garden supply business carried on by [Appellee Central Farm]." Furthermore, Appellant Hostetler agreed not to "enter into or engage in any business, including but not limited to operating a packaging supplies distribution business which directly or indirectly competes with [Appellee Central Farm]." One of appellee's main defensive arguments throughout the trial was that Appellant Hostetler had breached said

agreement by soliciting twine sales from Central Farm's own customers, acting on behalf of Joe Franks, who had been removed from his position as appellee's president and had started a competitive firm. Appellant charges that this argument was unsupported by the witnesses and evidentiary documentation, and, as further analyzed in our discussion of the Second Assignment of Error, was allegedly based on improper hearsay.

{¶43} However, the record reveals that Franks, who admittedly had become a close friend of appellant, testified that when he was thinking of starting up a competing twine business, he had sometimes "bounced ideas" off appellant and asked him what products would interest twine consumers. See Tr. at 288. Phone records were produced at trial demonstrating that after the new business, JBF, Inc. was commenced, Franks spent more than 10,000 minutes conversing on the phone with appellant. Although they testified that the majority of this time was spent talking about personal and religious matters, their testimony indicates that Franks was using appellant and his experience as a resource to answer questions about twine and solve his customers' problems. These are the types of services that Franks had earlier determined were valuable to Central Farm and warranted a salary. See, e.g., Tr. at 266. These phone records thus provided circumstantial evidence that appellant had done more than just indirectly assist Franks and JBF.

{¶44} Appellant nonetheless adds that even if we conclude Appellee Central Farm had presented competent evidence to support its allegation that appellant had breached the Purchase Agreement, appellee failed to present evidence of monetary damages resulting from the conversations with Franks. However, as appellee aptly

responds, the jury could properly conclude that the harm to Central Farm was the same whether appellant was doing it for friendship or for financial gain. Appellant assisted his good friend Franks in growing JBF, which now has most of appellee's former customers and 75% of the twine market formerly served by Central Farm, after just three years of operation. See Tr. at 325.

**{¶45}** Furthermore, although appellant has challenged it on hearsay grounds, additional testimony was adduced that appellant continued to carry on phone conversations with representatives of his former accounts at Central Farm. Many of these phone calls with these former customers were then followed up with calls to Franks. While appellant asserted that the customer conversations were informal and non-business related, we find it was within the province of the jury to determine that such explanation was implausible.

### *Appellant's Provision of Customer and Price Lists*

**{¶46}** It is undisputed that appellant continued to operate Hostetler Farm Supply for three years after purportedly selling the assets (i.e., his customer and price lists) from Hostetler Farm Supply to Appellee Central Farm. The jurors could have concluded that appellant, by continuing to maintain Hostetler Farm Supply and selling to his own loyal customers, assured that those customers would continue to identify him personally as their source of twine, and would not begin to buy twine from Central Farm's network of wholesale dealers. Furthermore, while appellant was serving as the sales representative to Hostetler Farm Supply, he was selling Central Farm's twine to his d/b/a at a loss, although some of this may have resulted from appellant's sale of

damaged product for Central Farm. Again, it was the jury's prerogative to weigh the import of such evidence.

{¶47} Appellant seeks to justify his practice of maintaining his own retail customers by reading the purchase agreement as pertaining to selling his "commercial" customer list only. He maintains Central Farm instructed him to concentrate exclusively on sales to its commercial twine accounts. He claims that Central Farm benefited in selling twine at dealer prices to appellant for resale to his neighbors and other "retail" customers who could not purchase directly from Central Farm at wholesale prices and would not likely purchase twine from Central Farm's other dealers. Appellant also asserts that Franks and Olson originally had no interest in having Central Farm acquire the portion of the business involving Hostetler's sales to neighbors and other "retail" customers, on the basis that Central Farm was chiefly a wholesale distributor. While certainly appellant was allowed to purchase twine from appellee at dealer cost under Section 5.3(c) of the agreement, we find the jury could have properly determined that this retention of personal customers by appellant was a material breach.

{¶48} Ultimately, the evidence is consistent that appellant never actually provided Central Farm with either of the two documents that it was entitled to under the Agreement. Appellant admittedly never provided a price list, and he also decided not to provide a complete and accurate customer list as required. Instead, he provided only the names of his wholesale or commercial customers, despite the language of the agreement, simply determining on his own that Central Farm did not really want or need the complete list.

{¶49} Thus, appellant fails to demonstrate reversal would be warranted as to the jury's conclusion that the breaches to the agreement were material. See *Kersh*, supra. As appellee aptly responds, the evidence indicates that Central Farm was deprived of the expected benefit of the contract. Over the course of three years, he sold $175,000 worth of wrapping products to his own customers for his own profit, after buying the twine from Central Farm below its out-of-pocket cost. Central Farm was likely unable to retain many of appellant's customers because of appellant's incomplete lists and his assistance to competitor Franks and JBF, Inc. Finally, the jury could have properly determined that appellant, despite his contentions to the contrary, will not suffer forfeiture. Appellant testified he merely faxed the customer list to Central Farm, although he later lost or misplaced the original. Tr. at 159. The jurors could have determined that appellant kept his retail customers, and assisted a competing company going after his wholesale customers. The jurors could have further determined that appellant cannot now cure his breach, and that he has failed to deal with Central Farm in good faith.

<u>*Appellant's Claim of Rescission by Appellee*</u>

{¶50} Appellant finally advances the theory that appellee's counterclaim in the suit below was "essentially" a claim for rescission. He proceeds to argue that rescission is unwarranted as appellee has suffered no damages and has defaulted on the remainder of the purchase price. In support, he cites *Simes v. Beaver Valley Resort*, Clark App.No. CA 2925, 1992 WL 274656; *Holt v. Ohio Machinery*, Franklin App.No. 06AP-911, 2007-Ohio-5557.

**{¶51}** It is well-established that "[w]here there has been a breach of a material and vital provision of a contract by one party, the other party thereto may either treat the contract as terminated and rescind it and pursue the remedy that such rescission entitles him to, or he may sue for damages for a breach of the contract." See *Wilson v. Kreusch* (1996), 111 Ohio App.3d 47, 56, 675 N.E.2d 571, citing 18 Ohio Jurisprudence 3d (1980) 230, Contracts, Section 309. Furthermore, the remedy of restitution may be appropriate, even though a case is not specifically pleaded in rescission, when the evidence is uncontestable that rescission was intended and actually did occur. See *Cincinnati Bible Seminary v. Griffiths* (Oct. 10, 1984), Hamilton App.No. C-830867, citing See *Purvis v. Davish* (June 21, 1986)*,* Hamilton App.No. CA 75-07-0058.

**{¶52}** Thus, appellant appears to be initially correct that rescission may be determined even if not specifically pled. Nonetheless, upon review, we do not conclude that appellee was seeking rescission as part of its counterclaim. Indeed, appellee sought and obtained relief from further payments to appellant under the purchase agreement, and it will not get back the $82,500 it paid to appellant under the agreement. As appellee aptly notes, it is proper for a jury, where counterclaims have been presented, to determine that neither side has met its respective burden. See *Lazzaro v. Picardini,* (January 24, 1992), Lake App.Nos. 91-L-023, 91-L-024.

**{¶53}** We thus find no reversible error on the issue of claimed rescission, as urged by appellant.

*Conclusion*

{¶54} Based on the evidence presented of appellant's communication with Franks after the formation of JBF, appellant's communications with other buyers despite the covenant not to compete, and his failure to provide the full customer list to appellee, we hold the trial court's denial of appellant's motions for JNOV, new trial, and directed verdict did not constitute reversible error or an abuse of discretion.

{¶55} Appellant's First Assignment of Error is overruled.

II.

{¶56} In his Second Assignment of Error, appellant contends the trial court erred in permitting appellee's current president, Corey Sheely, to testify as to information about appellant's customers, claiming impermissible hearsay. We disagree.

{¶57} As a general rule, all relevant evidence is admissible. Evid.R. 402. However, "[h]earsay is not admissible except as otherwise provided by the Constitution of the United States, by the Constitution of the State of Ohio, by statute enacted by the General Assembly not in conflict with a rule of the Supreme Court of Ohio, by these rules, or by other rules prescribed by the Supreme Court of Ohio." Evid.R. 802. Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C).

{¶58} In the case sub judice, appellee's counsel questioned Sheely about, inter alia, communications he had conducted with two customers, Gerber Feed and United Rope (via owner Gary Zwack). The pertinent portions of Sheely's testimony are as follows:

**{¶59}** "Q. Okay, but what about other examples? Tell me about the things you did to investigate whether [Appellant Hostetler] was living up to these obligations or complying with this contract?

**{¶60}** "Well I decided that, again with everything else that was going on within the company, I decided that I was going to get out and try to investigate to find out for myself, which you know, we're a pretty small company, and so I, I hooked up with the sales, the salesmen that sells general merchandise to, to customers in certain areas and I went out with them, and in particular a customer down in Baltic, Ohio, by accompanying the sales rep into that facility just to kind of see what I could find out about what was going on.

**{¶61}** "Q. Okay, what was the name of that customer?

**{¶62}** "Gerber Feed.

**{¶63}** "Q. And when did this occur?

**{¶64}** "Oh, this was late 2008, winter of 2008, might have been first of the year.

**{¶65}** "Q. Okay, and what did you do once you got there?

**{¶66}** "Well I just went in and, and, there was a young lady, who was Launa, behind the desk and --

**{¶67}** "THE COURT: What?

**{¶68}** "[APPELLANT'S TRIAL COUNSEL] MR. BERTSCH: Objection.

**{¶69}** "THE COURT: Are you objecting to the answer? I'm --

**{¶70}** "MR. BERTSCH: I, yes, your Honor, because I –

**{¶71}** "THE COURT: -- just trying to figure out what you were --

**{¶72}** "MR. BERTSCH: Yes, your Honor, I mean I think to the extent that he's going to start recounting conversations with a customers, that's hearsay so the question, I didn't object to the question in general, but I believe the answer, I don't know if it's already been cautioned or not, but I'm just doing it on, on a preventative basis.

**{¶73}** "[APPELLEE'S TRIAL COUNSEL] MR. PETTORINI: So this is a preventative objection? I, I'm not sure I follow the – the question was what did he do when he got to the customer's place of business.

**{¶74}** "THE COURT: Okay, all right. I'm - the question is not objectionable, so you need to sit down.

**{¶75}** "* * *

**{¶76}** "Q.  Well let me, -- I, I know you lost your train of thought, Corey.  First off, were they still selling twine?

**{¶77}** "Yes.

**{¶78}** "Q.  And did you ask about twine sales?

**{¶79}** "Yes.

**{¶80}** "MR. BERTSCH:  Objection, objection, your Honor.

**{¶81}** "THE COURT:  Did he ask about twine sales, is overruled.  You may answer.

**{¶82}** "Yes.

**{¶83}** "Q. And did you specifically ask about Bill Hostetler selling twine?

**{¶84}** "Yes.

**{¶85}** "Q. What'd you find out?

**{¶86}** "MR. BERTSCH: Objection.

**{¶87}** "Where, you know --

**{¶88}** "THE COURT: Well just a minute, Mr. Sheely. Let's just have a sidebar

**{¶89}** "(Whereupon, the following was held at sidebar:)

**{¶90}** "THE COURT: The question is what did you find out.

**{¶91}** "MR. BERTSCH: I'm objecting on hearsay. Basis, your Honor, this, this case has been pending for a year and a half, you know, they could have brought any of these customers in, instead of trying to get in the back door by hearsay statements as to what was said to Mr. Sheely by some customer. He used it for the truth of the matter asserted that Mr. Hostetler was selling to that customer and that's the whole point of this, and if they're going to have that evidence come in, it behooves them to have the actual customer come in and say yes, Mr. Hostetler sold to them.

**{¶92}** "THE COURT: Do you know the answer?

**{¶93}** "MR. PETTORINI: Do I know the answer?

**{¶94}** "THE COURT: To the question you just asked.

**{¶95}** "MR. PETTORINI: What he found? He found out that Bill Hostetler was selling to them.

**{¶96}** "THE COURT: Okay.

**{¶97}** "MR. PETTORINI: That's the conclusion he, he reached. He's not going to make any statements --

**{¶98}** "THE COURT: Relay any conversation.

**{¶99}** "MR. PETTORINI: These questions are carefully crafted to --

**{¶100}** "THE COURT: Avoid hearsay.

{¶101} "MR. PETTORINI: -- avoid hearsay.

{¶102} "MR. BERTSCH: Your Honor, at this --

{¶103} "MR. PETTORINI: And what he finds out in his investigation is relevant, and he's not going to say what someone else told him. He's going to say what, based on this investigation, based on going to his customers, what he concluded, and that is perfectly acceptable testimony and does not run afoul of the hearsay.

{¶104} "THE COURT: Thank you.

{¶105} "MR. BERTSCH: Your Honor, basically what he's going to testify, if he says I concluded he was selling this to Hostetler, he has no information to conclude that other than the hearsay statement of a customer telling that to him. So to the extent that his opinion testimony, his conclusion is based upon hearsay statements by a third party, what they're essentially trying to do is back door in the same stuff that they can't do by having him say what did he tell you? Okay, don't tell us what he told you, but tell us what you concluded after your discussion with that customer.

{¶106} "THE COURT: Okay, and I think that's a proper question. So I'm going to overrule it.

{¶107} "(Whereupon, the following was held in open court:)

{¶108} "THE COURT: Okay, Mr. Sheely, the question is what did you conclude, and again, would just caution you not to relay specific conversations you had with others. Okay, so the pending question is what did you conclude from that:

{¶109} "Well yeah, because I really didn't get an answer, so there was no conversation other than I concluded that there was obviously a relationship there that didn't, that they didn't want to breach.

**{¶110}** "Q. A relationship with Mr. Hostetler?

**{¶111}** "MR. BERTSCH: Move to strike, your Honor.

**{¶112}** "THE COURT: Overruled. Go ahead.

**{¶113}** "Yes.

**{¶114}** "* * *

**{¶115}** "Q. After this visit was there any doubt in your mind that Mr. Hostetler was out there competing?

**{¶116}** "MR. BERTSCH: Objection to the form of the question.

**{¶117}** "THE COURT: Overruled. He may answer.

**{¶118}** "Ask me again please.

**{¶119}** "Q. Sure. After this visit to Gerber Feed was there any doubt in your mind that Mr. Hostetler was competing?

**{¶120}** "No." Tr. at 385-390.

**{¶121}** "****

**{¶122}** "Q. And you would receive communications or, well communications from them [buyers] via e-mail?

**{¶123}** "Yes.

**{¶124}** "Q. And did you ever receive communication, via e-mail, regarding what Mr. Hostetler was doing?

**{¶125}** "MR. BERTSCH: Objection, your Honor.

**{¶126}** "I did.

**{¶127}** "THE COURT: Oh, just a minute, Did you receive the communication via e-mail? That, that is overruled, and he answered I did. I think that's fine.

**{¶128}** "Q. And who was this communication from?

**{¶129}** "Commiss-communication was from a fellow at United Rope, Gary Zwack, the owner, the president, whatever, he was the decision maker at United Rope.

**{¶130}** "Q. And do you know what happened with Mr. Zwack?

**{¶131}** "I mean with his passing?

**{¶132}** "Q. Yeah.

**{¶133}** "Yeah, he has since passed away.

**{¶134}** "Q. After you received this communication, did it help you make any decisions with respect to Mr. Hostetler and his contract?

**{¶135}** "Well with yeah, with the nature of it I, I felt, you know, that, you know, that we had, we had a problem.

**{¶136}** "MR. PETTORINI: Your Honor, at this time I'd like to proffer exhibit BB.

**{¶137}** "THE COURT: Okay, it would be proffered. Thank you.

**{¶138}** "Q. At this point did you believe that Mr. Hostetler was helping Mr. Franks in his twine business?

**{¶139}** "MR. BERTSCH: Objection, your Honor.

**{¶140}** "THE COURT: Overruled. You may answer.

**{¶141}** "I did." (Tr. at 392-393).

**{¶142}** We herein review the trial court's decision regarding the admission of hearsay in light of Evid.R. 103(A) and the standard established in Civ.R. 61.

**{¶143}** Evid.R. 103, provides in relevant part:

**{¶144}** "(A) Effect of erroneous ruling

{¶145} "Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected…."

{¶146} Civ.R. 61 sets forth the harmless error rule in civil cases, providing in pertinent part that no error or defect in any ruling is "ground for granting a new trial or for setting aside a verdict or for vacating, modifying or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice."

{¶147} "Generally, in order to find that substantial justice has been done to an appellant so as to prevent reversal of a judgment for errors occurring at the trial, the reviewing court must not only weigh the prejudicial effect of those errors but also determine that, if those errors had not occurred, the jury or other trier of the facts would probably have made the same decision." *Hallworth v. Republic Steel Corp.* (1950), 153 Ohio St. 349, 91 N.E.2d 690, paragraph three of the syllabus. If hearsay evidence is objected to and permitted to go to the jury, the judgment must be reversed unless it affirmatively appears in the record that the party is not prejudiced. *Westinghouse Elect. Corp. v. Dolly Madison Leasing & Furniture Corp.*(1975), 42 Ohio St.2d 122, 326 N.E.2d 651; *Wilson v. Barkalow*, 11 Ohio St. 471, 1860 WL 83; *Lowe v. Lehman*, 15 Ohio St. 179, 1864 WL 23.

{¶148} Appellee responds that Sheely's testimony was in the form of "conclusions" Sheely reached after communicating with Gerber and United Rope, and it maintains such conclusions do not constitute impermissible hearsay. We do not agree with appellee's responsive legal argument, and because the objected-to evidence was hearsay which did not fall into one of the recognized exceptions which

would permit it to be admitted, the trial court did not have discretion to allow the statements into evidence. However, after weighing the prejudicial effect of the evidence we find that if the statements had not been admitted, the jury would probably have made the same decision.

{¶149} Appellant's Second Assignment of Error is therefore overruled.

III.

{¶150} In his Third Assignment of Error, appellant contends the trial court erred in declining to allow the submission of certain jury interrogatories. We disagree.

{¶151} Jury interrogatories are addressed in Civ.R. 49(B), which states:

{¶152} "The court shall submit written interrogatories to the jury, together with appropriate forms for a general verdict, upon request of any party prior to the commencement of argument. Counsel shall submit the proposed interrogatories to the court and to opposing counsel at such time. The court shall inform counsel of its proposed action upon the requests prior to their arguments to the jury, but the interrogatories shall be submitted to the jury in the form that the court approves. The interrogatories may be directed to one or more determinative issues whether issues of fact or mixed issues of fact and law.

{¶153} "The court shall give such explanation or instruction as may be necessary to enable the jury both to make answers to the interrogatories and to render a general verdict, and the court shall direct the jury both to make written answers and to render a general verdict.

{¶154} "When the general verdict and the answers are consistent, the appropriate judgment upon the verdict and answers shall be entered pursuant to Rule 58. When

one or more of the answers is inconsistent with the general verdict, judgment may be entered pursuant to Rule 58 in accordance with the answers, notwithstanding the general verdict, or the court may return the jury for further consideration of its answers and verdict or may order a new trial."

**{¶155}** In *Cincinnati Riverfront Coliseum, Inc. v. McNulty Company* (1986), 28 Ohio St.3d 333, the Ohio Supreme Court held Civ.R. 49 places a mandatory duty upon the trial court to submit timely interrogatories to the jury, provided the interrogatories are in a form the court approves. An interrogatory must be drafted to test a finding on a determinative issue, and a trial court is not required to reformulate a defective interrogatory. Instead, the court has discretion to reject an improper interrogatory. See *Freeman v. Norfolk & Western Railway Co.* (1994), 69 Ohio St.3d 611, 614.

**{¶156}** Appellant requested the submission of the following three interrogatories to the jury:

**{¶157}** "Did William Hostetler breach the Purchase Agreement? *** If your answer is no, then do not answer Interrogatory 2 or 3."

**{¶158}** "If your answer to the prior question is yes, please state in what respect William Hostetler breached the Purchase Agreement."

**{¶159}** "Please state the amount of damages, if any, that Central Farms [sic] sustained as a direct result of any breach of the Purchase Agreement identified in your prior answer." Appellant's Appendix at A-10.

**{¶160}** In the case sub judice, the trial court had issued a scheduling order requiring jury interrogatories to be filed one week before trial. Appellant actually untimely submitted his proposed interrogatories several days after the commencement

of trial. Nonetheless, having reviewed three aforecited proposed interrogatories, we agree with appellee's responsive argument that they may likely have confused the jury as to the burden of proof required of appellant, as they go beyond simply asking if appellant had demonstrated he had performed under the 2004 agreement. As such, we find the trial court did not abuse its discretion in refusing to submit the interrogatories to the jury.

{¶161} Appellant's Third Assignment of Error is therefore overruled.

IV.

{¶162} In his Fourth Assignment of Error, appellant contends the trial court erred in denying his motion for a new trial based on the manifest weight of the evidence. We disagree.

{¶163} Civ.R. 59(A) allows a trial court to grant a new trial upon motion, including one asserting that the judgment is not sustained by the weight of the evidence. Our standard of appellate review on a motion for new trial is abuse of discretion. *Anthony v. Hunt* (Feb. 9, 1998), Stark App.No.1997CA00170. In order to find an abuse of discretion, we must find the trial court's decision was unreasonable, arbitrary or unconscionable and not merely an error of law or judgment. *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219, 450 N.E.2d 1140. In reviewing a decision on a motion for new trial, an appellate court must view the evidence in a light most favorable to the trial court's decision, rather than in favor of the nonmoving party. See *Jenkins v. Krieger* (1981), 67 Ohio St.2d 314, 320, 423 N.E.2d 856. Furthermore, "[a] civil judgment which is supported by competent and credible evidence may not be reversed

as against the manifest weight of the evidence." *State v. McGill,* Fairfield App.No. 2004–CA–72, 2005–Ohio–2278, ¶ 18.

{¶164} Appellant's essential argument again is that the evidence does not demonstrate that he materially breached his end of the 2004 agreement. Based on our previous analysis herein, and in viewing the evidence in a light most favorable to the trial court's decision, we are unpersuaded that the court's refusal to grant a new trial on the basis of the manifest weight of the evidence was unreasonable, arbitrary or unconscionable.

{¶165} Accordingly, appellant's Fourth Assignment of Error is overruled.

*Central Farm Cross-Appeal*

I.

{¶166} In its First Assignment of Error on cross-appeal, Appellee Central Farm contends the jury's verdict in favor of Appellant Hostetler on his breach of account cause of action was against the manifest weight of the evidence. We disagree.

{¶167} "A civil judgment which is supported by competent and credible evidence may not be reversed as against the manifest weight of the evidence." *McGill,* supra, at ¶ 18. In order to find an abuse of discretion, we must find the trial court's decision was unreasonable, arbitrary or unconscionable and not merely an error of law or judgment. *Blakemore, supra.*

{¶168} "An action on an account, although founded on contract, 'exists only as to the balance that may be due one of the parties as a result of [a] series of transactions.'" *Worldwide Asset Purchasing LLC v. Sandoval*, Stark App.No. 2007CA00159, 2008-Ohio-6343, f.n. 5, quoting *Am. Sec. Serv., Inc. v. Baumann* (1972), 32 Ohio App.2d

237, 242, 289 N.E.2d 373. "The purpose of an action on an account is 'to avoid the multiplicity of suits necessary if each transaction between the parties (or item on the account) would be construed as constituting a separate cause of action.'" Id., quoting *Baumann* at 242, 289 N.E.2d 373.

{¶169} As indicated previously herein, Hostetler Farm Supply was established by appellant's father. For years, Hostetler Farm supply had maintained a customer account at Appellee Central Farm. Even after execution of the 2004 purchase agreement, appellant continued to use the Hostetler Farm Supply account to purchase products from appellee. Trial testimony also indicated that appellee would periodically ask appellant to deliver to area customers some of the wholesale twine appellant had purchased from appellee and stored on his farm. Rather than engage in additional billing, appellee would simply credit the Hostetler Farm Account for the twine deliveries.

{¶170} At trial, appellant produced a credit statement produced by appellee on February 29, 2008, indicating a credit owed to appellant of $16,739.23. See Exhibit 10; Tr. at 139-141. Appellee did not respond to two letters sent by appellant and/or his attorney in April 2008 and May 2008 requesting a check for the $16,739.23 account balance. The jury ultimately awarded appellant $25,240.00 on his breach of account claim; however, this was later reduced by agreed remittitur to the amount of $16,739.23.

{¶171} In *Refrigeration & Air Conditioning Institute v. Rine* (1946), 80 Ohio App. 317, 75 N.E.2d 473, the court recognized: "It is generally accepted that he who seeks damages for a breach of contract bears the burden of proof, unless the statute

otherwise dictates or knowledge is peculiarly within the possession of the other contracting party who must, in such case, bear the burden of producing it."

{¶172} In the case sub judice, appellee's account manager, Betsy Dusenberry, effectively admitted that Central Farm owed the credit balance to Hostetler. Tr. at 337-345. Additional testimony further indicated that Central Farm had backup records regarding the credit balance at the time appellant requested payment in the spring of 2008; however, Central Farm lost or destroyed these records after Dusenberry left the company in June 2009. Id.; Tr. at 398, 411-412. Joe Franks, the former Central Farm president, tried to call into question the figure of $16,739.23 being rendered on credit invoices, or what the company coded as "999999999" invoices, rather than on a credit memo. See Tr. at 273-276. Such evidence of appellee's erratic management and bookkeeping practices during the time frame in question was a repeated theme throughout the trial. Indeed, Corey Sheely recalled what he encountered following when taking over as appellee's president:

{¶173} "Well it, it, it was a process that occurred over many years from what I, from what I gathered when I got in there. There was some things that I saw initially that concerned me, the lack of inventory control, the no -- doing no physical inventories, just kind of the controls that were in place. The, the emphasis on sales versus profitability, in other words, we were, it was we were trying like heck under Joe's leadership to get to 50, 60, 70 million in sales, with absolutely no regard for the expense it took to do that, and the profitability of the company was why, I think I stated the other day, that we were 50 million in sales with no profit, and our books were in such disarray that there was absolutely no way to even know if the company was

making a profit. And so when I was asked to step in, the litigation began to take place. I just tried to begin to firm things up as quickly as I possibly could, in an effort to, you know, hopefully save at that time 90, 80 to 90 jobs, keep the company -- when I was asked if I even wanted to even do this, when everything came to light, we were -- the inventory was in total disarray, we were under collateralized, banks were calling, vendors weren't paid, and Dick said can you step in and do something about this and I was like, well you know, I might as well because I don't have anything better to do, at that time, and I, I believed in and the employees believed in what the company had there. I mean the infrastructure of the company, the nitch the company provided, the customer base we had, the trucks and all the equipment we had, we had the makings of a, of a successful company. It just had been terribly, terribly mismanaged, in my mind." Tr. at 353-354.

{¶174} Upon review, we hold that the jury was entitled to rely on Central Farm's own business record, i.e., the credit statement of February 29, 2008, as an admission and prima facie evidence of the account balance owed appellant, and the jury's rejection of appellee's response thereto in regard to the breach of account claim was not against the manifest weight of the evidence.

{¶175} Cross-Appellant's First Assignment of Error is overruled.

II.

{¶176} In its Second Assignment of Error on cross-appeal, appellee contends the jury's verdict in favor of appellant on the "account stated" cause of action was against the manifest weight of the evidence. We disagree.

**{¶177}** In *Gunton Building Specialties v. G.H.& M. Development and Construction*, Stark App.No 5381, 1981 WL 6202, this Court stated: "An 'account stated' is defined as the settlement of an account between the parties, with a balance struck in favor of one of them. Put another way, an 'account stated' is rendered by the creditor and by the debtor assented to as correct, either expressly, or by implication of law from the failure to object. *** Once an 'account stated' is established, it is prima facie evidence of its correctness and a party seeking to set it aside must do so on grounds of mistake or fraud and the party so doing has the burden of proving mistake or fraud by clear and convincing evidence."

**{¶178}** However, in order to secure reversal of a judgment, a party on appeal must generally show that a recited error was prejudicial. See *Tate v. Tate,* Richland App.No. 02-CA-86, 2004-Ohio-22, ¶ 15 (additional citations omitted). In the case sub judice, the verdict form for the "account stated" cause of action (cause of action number 3), which in this instance is rendered for appellant, directed the jury not to insert a damage amount if damages had already been awarded for the breach of account cause of action (cause of action number 2). Accordingly, the jury duly left the damages line blank in the account stated verdict form. Under these circumstances, we find further analysis of the issue of the account stated claim to be unnecessary.

{¶179} Cross-Appellant's Second Assignment of Error is overruled as moot.

{¶180} For the reasons stated in the foregoing opinion, the judgment of the Court of Common Pleas, Tuscarawas County, Ohio, is hereby affirmed.

By: Wise, J.

Gwin, P. J., and

Edwards, J., concur.

.

_____

_____

_____

JUDGES

JWW/d 0106

IN THE COURT OF APPEALS FOR TUSCARAWAS COUNTY, OHIO
FIFTH APPELLATE DISTRICT

WILLIAM HOSTETLER                          :
                                           :
  Plaintiff-Appellant/Cross-Appellee      :
                                           :
-vs-                                       :          JUDGMENT ENTRY
                                           :
CENTRAL FARM AND GARDEN, INC.              :
                                           :
  Defendant-Appellee/Cross-Appellant      :          Case No. 2010 AP 12 0046

For the reasons stated in our accompanying Memorandum-Opinion, the judgment of the Court of Common Pleas of Tuscarawas County, Ohio, is affirmed.

Costs to be split evenly between Appellant and Appellee.

_____

_____

_____

JUDGES